**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| DONALD MACKENZIE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>GOLDEN HEARTS GAMES, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Donald MacKenzie ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Golden Hearts Games, Inc. ("Golden Hearts" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**INTRODUCTION**

1.      Defendant Golden Hearts Games, Inc. owns and operates the popular online casino website, www.goldenheartsgames.com, where visitors can and do bet real money on slots, blackjack, and other games of chance.

2.      Defendant's website has been shut down by state authorities in several states for offering "online gambling games," operating without "a casino gaming license," and for being "illegal, dangerous, and …seriously ruin[ing] people's finances." *See* Exs. 1-3. But it still continues to operate illegally in this state, and in most states.

3.      Golden Hearts describes its website as the "best free-to-play casino," and is accessible and available to Massachusetts residents and other players across the United States.

4.      However, by operating its online casino, Defendant has violated Massachusetts law,

which governs Plaintiff's and the Class's claims, and Defendant has illegally profited from tens of thousands of consumers.  Accordingly, Plaintiff, on behalf of himself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees, and an injunction shutting down operation of the website.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the Class is a citizen of a State different from the Defendant.

6.      This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within this District and a substantial portion of the events that gave rise to Plaintiff's claims occurred in this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant transacts business and/or has agents within this District.

## PARTIES

8.      Plaintiff Donald MacKenzie is a natural person and a citizen of the Commonwealth of Massachusetts, residing in Waltham, Massachusetts.  Plaintiff has gambled and lost money on www.goldenheartsgames.com.

9.      Defendant Golden Hearts Games, Inc. is a Delaware corporation headquartered at 7 Avenue de Lafayette, #121230, Boston, MA. Golden Hearts owns and operates the www.goldenheartsgames.com website.

<u>**FACTUAL ALLEGATIONS**</u>

A.    **Gambling Is Generally Illegal In Massachusetts, With Limited, Highly Regulated Exceptions**

10.    Although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like www.goldenheartsgames.com are unlicensed and unregulated. A gambling license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints.    Defendant dodges all these requirements.

11.    By statute, most forms of gambling are illegal in Massachusetts, with a few exceptions that are highly regulated. The term "illegal gambling" is defined as follows:

> **a banking or percentage game played with cards, dice, tiles, dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value**, but excluding: (i) a lottery game conducted by the state lottery commission under sections 24, 24A and 27 of chapter 10; (ii) a game conducted under chapter 23K[1]; (iii) sports wagering conducted under chapter 23N; (iv) pari-mutuel wagering on horse races under chapters 128A and 128C and greyhound races under said chapter 128C; (v) a game of bingo conducted under chapter 271; (vi) charitable gaming conducted under said chapter 271[2]; and (vii) a fantasy contest conducted under section 11M1/2.[3]

---

[1] A "game conducted under chapter 23K" is one that is licensed by the Massachusetts Gaming Commission. *See Abdow v. Attorney General*, 468 Mass. 478, 484 (2014) (explaining amendments to Chapter 4, section 7).

[2] Chapter 271, section 22A permits playing "whist or bridge" for prizes, so long as "the entire proceeds of the charges for admission to such game are donated solely to charitable, civil, educational, fraternal, or religious purposes."

[3] "Fantasy contests" refers to fantasy sports games. *See* Mass. Gen. Laws ch. 12, § 11M1/2 ("fantasy contests" means a "fantasy or simulated game or contest based on professional sports events in which: (i) the value of all prizes and awards offered to winning participants are established and made known to the participants in advance of the contest; (ii) all winning outcomes reflect the relative knowledge and skill of the participants and shall be determined predominantly by accumulated statistical results of the performance of individuals, including athletes in the case of sports events; and (iii) no winning outcome is based on the score, point spread, or any performance or performances of any single actual team or combination of Such teams or solely on any single performance of an individual athlete Or player in any single actual event.").

Mass. Gen. Laws Ann. ch. 4, § 7 (West) (emphasis added).

12.    Although the term "banking or percentage game" is undefined, it is a commonly used term in the gambling industry and includes unlicensed "casinos and slot parlors." *See Abdow*, 468 Mass. at 483.

13.    "In November 2011, the Legislature enacted the Expanded Gaming Act, St. 2011, c. 194 (act), that created the Gaming Commission …, and for the first time permitted casino and slots gambling in Massachusetts **by those awarded gaming licenses by the commission**." *Id.* at 480 (emphasis added). Companies that want to offer gambling face difficult requirements for licensing, including a $400,000 non-refundable application fee and millions of dollars in license fees for successful applicants. *See id.* at 481-82.

14.    As recently explained by the Massachusetts Supreme Court, "Where gambling has been legalized, the Legislature has strictly regulated it, giving administrative agencies broad powers to oversee its licensing and operation to protect the public interest." *Gattineri v. Wynn MA, LLC*, 493 Mass. 13, 20 (2023). "The text of the gaming act reflects this commitment to strict regulation to promote the integrity, and reduce the risks, of casino gambling." *Id.* at 21. "'[E]nsuring public confidence in the integrity of the gaming licensing process and in the strict oversight of all gaming establishments through a rigorous regulatory scheme is the paramount policy objective of [the gaming act].'" *Id.* (quoting G.L. c. 23K, § 1(1)).

15.    Golden Hearts dodges licensing fees that legitimate, regulated casinos pay, and avoids regulatory oversight that protects the public interest.

**B.    Defendant Uses Free "Social Gaming" As A Front For Real, Online Gambling**

16.    Defendant owns and operates www.goldenheartsgames.com, a popular, casino-oriented gaming website.

4

17.    Golden Hearts describes its website as a "free social casino website where players from across the United States can play their favorite casino or casino-style games," including "slot-machines, live-action multi-player bingo, keno, video poker, and instant win scratch games"[4] (hereinafter, the "Casino Games").



---

[4] The screenshots depicted in this brief are true and correct screenshot excerpts of Golden Hearts' website taken on October 7 or 11, 2024.

18.     As soon as users log onto the website, the first thing they see is an array of colorful, digital slot machines, along with information about the user's gambling balance near the top of the screen (denoted with "SC"):



19. Just like one would see on the floor of a brick-and-mortar casino in Las Vegas or Atlantic City, the digital slot machines come in a wide variety of styles and themes, such as the examples shown below:





20.    Another part of the website is dedicated to "Table Games," such as poker. Once any of these Table Games are accessed, the website digitally replicates a casino table game. When playing poker, for example, the user first bets virtual coins (with a set minimum bet), hits the "Deal" Button to reveal the first cards, and then chooses which cards to hold before the next cards are dealt.



21.     Defendant also misleads website users into believing that the website provides a legal form of entertainment that is not gambling.

22.     The deception is in the form of omissions and misleading partial representations that permeate the entirety of the website. The word "gambling" is found nowhere on the website. There is no mention of the fact that illegal internet cafés are the origin of the website. *See* Section C below.

23.     The website includes "official sweepstakes rules," conveying the impression that the website offers legitimate sweepstakes that comply with state laws, and not illegal sweepstakes prohibited under Massachusetts law.

24.     The website discloses a long list of states where the website is not accessible, including neighboring states Connecticut, and New York. The fact that Massachusetts is not included in the list of excluded territories misleadingly conveys the impression that the website is legal in this state. There is no mention of the fact that state authorities in several of the excluded states shut down operation of the website because it is an illegal gambling operation, and that Defendant involuntary withdrew from certain states to avoid criminal liability.

25.     All of the above-described omissions and partial representations have been a feature of the website during the entirety of the relevant period.

**C.     Defendant Has Deployed An Old Gimmick That Criminals Once Tried To Use To Evade Gambling Laws**

26.     Defendant will claim that www.goldenheartsgames.com is not really a gambling operation, but instead offers legal "sweepstakes." That is an old gimmick that was once popular among organized crime groups in the early 2000's. As detailed below, courts and law enforcement agencies consistently determined that the same business model Golden Hearts utilizes today is a pretext for illegal gambling. A federal district court has already held on summary judgment that one of Golden Hearts' competitors that operates materially the same way is an illegal gambling operation, and a jury

later awarded close to $25 million in damages to a class of Washington state residents. *See Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024).

27.    The sections that follow detail how illegal gambling operations at so-called "Internet cafés," which were popular in the early 2000s, evolved into the ubiquitous "social casinos" seen online today, and how Golden Hearts is an online version of an illegal Internet café.

### 1.    The Internet Café "Sweepstakes" Crime Trend Of The Early 2000's

28.    The early 2000's saw a nationwide crime trend where criminals attempted to evade gambling laws by offering gambling at "Internet cafés." These operations—often located in suburban strip malls—"promoted" the sale of products such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers. When customers purchased the product, they received a corresponding number of "sweepstakes" points for each dollar spent. Customers then used those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés.

29.    Most states' gambling laws require three elements: prize, chance, and consideration. By artificially separating the consideration from the chance to win real money, criminals believed that they could evade state gambling laws, while claiming that the activities were no different than the sweepstakes promotions offered by Publisher's Clearing House and McDonalds.

30.    Courts and state law enforcement officials in the United States repeatedly determined that such tactics were an obvious pretext and cover for illegal gambling. In fact, it appears that every court in the United States to address the issue has determined that Internet café's are illegal gambling operations. *See, e.g., Lucky Tunes #3 LLC v. Smith*, 2019 WL 13436322 (E.D. Tex. Nov. 18, 2019); *Texas v. Ysleta Del Sur Pueblo*, 2015 WL 1003879 (W.D. Tex. Mar. 6, 2015); *State v. Fellows*, 471 S.W.3d 555 (Tex. 2015); *U.S. v. Davis*, 690 F.3d 330 (5th Cir. 2012); *Moore v. Mississippi Gaming Comm'n*, 64 So.3d 537 (Miss. 2011); *Barber v. Jefferson, County Racing Ass'n., Inc.*, 960 So.2d 599

(Ala. 2006); *Jester v. State*, 64 S.W.3d 553 (Tex. 2001); *Midwestern Enterprises, Inc. v. Stenehjem*, 625 N.W.2d 234 (N. Dakota 2001); *Mississippi Gaming Comm'n. v. Six Electronic Video Gambling Devices*, 792 So.2d 321 (Miss. 2001).

31.    For example, in 2011, three individuals in Massachusetts were indicted and charged with various gaming charges in connection with the operation of two Internet cafés.  The defendants unsuccessfully argued that players were only paying for Internet time and that any gambling that occurred involved "legitimate sweepstakes offers."  *New England Internet Café, LLC v. Clerk of Superior Court for Criminal Business in Suffolk Cnty.*, 462 Mass. 76, 79 (2012).  In response, the Attorney General took the "unequivocal position that it constitute[d] illegal gambling."  *Id.*

32.    An individual in Mississippi was convicted of racketeering and gambling charges in connection with an Internet café where—like here—customers could play simulated games that resembled gambling programs, such as slot machines, keno, and poker.  Customers needed a "sweepstakes" code to play the game, but customers could not purchase a sweepstakes code outright.  Instead, customers received sweepstakes codes by purchasing something else in the store, such as food or phone minutes.

33.    In 2015, the California Supreme Court addressed Internet café gambling in *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015), where the defendant sold Internet time on computer terminals.  The defendant promoted the sale of Internet time and other products with a "sweepstakes" giveaway, wherein the defendant provided 100 "sweepstakes points" for each dollar spent, which could then be used to play games of chance.  The defendants denied that the operation involved gambling because they were supposedly only selling computer time, and that the sweepstakes games were "not gambling" but instead a "promotional game."  The Kern County District Attorney obtained a civil injunction for violations of California's gambling laws, and that injunction was affirmed on

appeal.

34.     In *Lucky Bob's Internet Café, LLC v. California Dept. of Justice*, 2013 WL 1849270 (S.D. Cal. 2013), the Bureau of Gambling Control, a bureau within the Department of Justice's Division of Law Enforcement, seized property owned by an Internet café where customers were given 100 entries to a sweepstakes for every $1 of purchased Internet time, which could then be used to play one of seventeen casino-style games. The Internet café owner sued for declaratory relief, seeking a declaration that the operation did not violate California's gambling laws because, among other reasons, it was missing the element of consideration. The district court rejected that argument, granting summary judgment in favor of the California Department of Justice.

35.     In *Telesweeps of Butler Valley, Inc. v. Kelly*, 2012 WL 4839010 (M.D. Pa. Oct. 10, 2012), a Pennsylvania federal court held that the purchase of a long-distance telephone card that came with a commensurate number of free entries to participate in a 'casino-style' sweepstakes game constituted "indirect consideration" to participate in the sweepstakes, even though no purchase was necessary and (like here) alternative methods of free entry were available. In rejecting the defendant's argument that the customer was simply paying for telephone time and not the sweepstakes entries, the court declared that "plaintiff's attempt to separate the consideration from the chance to win by inserting a step between the two elements is clever, but it merely elevates form over substance. At bottom, what Telesweeps is doing constitutes gambling." *Id.* at *9.

36.     The Ohio Court of Appeals said it best when rejecting a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731, 744 (2013): "**the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance**." (Emphasis added). The court added, "there is no justification for ignoring the nature of the transaction simply because

the system is designed in such a way as to artificially isolate one part of the illegal transaction from another. The justice system is not so blinded by chicanery." *Id.*

### 2. The Rise Of ChumbaCasino.Com And The Wave Of Imitators Like Golden Hearts

37.  Golden Hearts not only owes its existence to Internet cafés of the early 2000's, but also to the inventor of "social casino" websites like www.goldenheartsgames.com: an Australian  company called VGW and its leader Lawrence Escalante. VGW runs other "social casino" websites that are similar to Golden Hearts in all material respects, called ChumbaCasino.com,  LuckylandSlots.com, and GlobalPoker.com.

38.  Mr. Escalante and VGW have been credited with bringing the Internet café model online with the launch of their gambling websites.  Reportedly, in meetings, Mr. Escalante and company executives had discussed Internet cafés in Florida that had—as of that time—managed to avoid restrictions on gambling by offering so-called sweepstakes games with chances to win prizes if customers purchased access to onsite computers.[5]

39.  VGW later publicly admitted that ChumbaCasino.com and its other websites are modelled on illegal Internet cafés.

40.  Specifically, in 2016, VGW had looked to equity markets for financing, and attempted a backdoor listing through a company called Synergy Plus.

---

[5] Riordan and Samios, *Laurence Escalante Is Living Large Off Controversial Gambling Billions*, Australian Financial Review, Mar. 19, 2024, available at https://www.afr.com/companies/games-and-wagering/laurence-escalante-is-living-large-off-controversial-gambling-billions-20240304-p5f9kc.

41.    In connection with that effort, VGW issued a January 4, 2016 prospectus explaining how the social casino concept is modelled on the illegal Internet cafés that were popular in the early 2000's:

67  Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.

68  Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

42.    The prospectus also explains how, at the time, "**Internet Sweepstakes Cafes are reported to have turned over $10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states,**" and described the "significant opportunity" of adopting the "sweepstakes café model." *Id.* at 95-96.

43.    The prospectus was prepared by H2 Gambling Capital, which is described as "the leading authority regarding market intelligence on the global gambling industry." *Id.* at 68. The prospectus refers to "gambling" 79 times, and noted that "**despite significant prohibition**, [the U.S.] remains by far the largest gaming market in the world." *Id.* at 69 (emphasis added).

44.    Likewise, in an October 2015 press release in Australia, the operators of ChumbaCasino.com stated that its gambling websites are "targeting the global casino market, particularly the unrealised [sic] United States **real-money gaming market**":

- VGW is an Australian technology and online gaming company that develops and operates international cash-prize contests through its innovative social casino products.  It currently operates on the largest social network and leverages the world's leading payment provider platforms.

- VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market.

45.    Ultimately, the Australian Securities and Investments Commission put a stop on the prospectus and killed the transaction, reportedly over concerns that the business violated gambling laws.

46.    Despite that setback in 2016, VGW's ChumbaCasino.com and other gambling websites have been enormously profitable.  The COVID-19 pandemic turbocharged the industry, and Lawrence Escalante reportedly became the youngest billionaire in Australia's history.  VGW's gambling revenues were reportedly $2.8 billion in 2024.

47.    The success of ChumbaCasino.com and other VGW gambling websites spawned a massive wave of copycat websites.  Today, the industry reportedly has a compound annual growth of 31% with industry-wide revenues expected to reach $6.9 billion in 2025.

48.    For example, a website called Games Island (https://gamesislands.com/about) offers aspiring business owners a chance to set up their own "successful casino operation" by helping them create and run either their own social casino/ sweepstakes website, or alternatively, brick-and-mortar internet cafes. This fact further underscores how the two operations are essentially the same thing.

49.    Golden Hearts is one of the many copycat companies hoping to replicate VGW's success by reinventing Internet cafés so that they can be accessed from home instead of requiring a drive to a nearby strip mall. As shown in the next section, Defendant's website operates materially the same way as the earlier Internet cafés.

### 3.    Golden Hearts' Website Is An Online Version Of An Internet Café

50.    The Casino Games offered on www.goldenheartsgames.com are gambling, and are no different than if they were played in a Las Vegas casino. Much like in a real casino, players purchase online coins (akin to gambling chips), and then redeem their winnings for cash.

51.    However, as a cover for its gambling operations, Golden Hearts attempts to separate the element of consideration from chance by offering a two-tiered system of virtual coins, both of

which function like casino chips, while calling the whole affair a "sweepstakes."

52.    That claim is false: no rational business gives away real cash for gambling winnings to customers who never placed bets using real money.  Such a company would go out of business quickly. As explained below, the free "social casino" component of Defendant's website is just a pretext or front for the gambling component.

53.    The first type of virtual currency, called "Gold Coins," can be used to play the casino games in "Standard Play" mode with no potential to win money.  When using Gold Coins, a player can only win or lose Gold Coins. However, for the most part, people only go to www.goldenheartsgames.com to engage in real-money gambling, so those Gold Coins are largely ignored. They serve the same role that internet time or long distance minutes did at traditional internet cafés.

54.    The second type of virtual currency—called "Sweeps Coins"—can be used to play the same casino-style games in a "Promotional" mode, where they carry real monetary value and can be redeemed for cash. To get Sweeps Coins, players typically must purchase them in a package with Gold Coins. Golden Hearts pretends that the Sweeps Coins are a "free" bonus added to the sale of Gold Coins, but as shown below, that is the same tactic Internet café owners unsuccessfully argued before.

55.    There are two other problems with the notion that Sweeps Coins is just a "free" add-on bonus to the Gold Coins.

56.    First, as noted above, most people ignore the Gold Coins after buying them.

57.    Second, and more importantly, Sweeps Coins are a proxy for real money. Depending on the package bought, there is a 1:1 or nearly 1:1 correlation between the number of dollars spent and the value of Sweeps Coins provided in each purchase.

58.    For example, if a user spends $100, he or she receives 10 million Gold Coins, but also receives 50,000 supposedly "free" Sweeps Coins. Sweeps Coins have a redemption rate of .002, so 50,000 Sweeps Coins is equivalent to $100—**the same amount that was charged for the Gold Coins.**



59.     Likewise, Sweeps Coins can be redeemed for "thousands of dollars in real cash prizes."

of redeeming Sweeps Coins, further underscoring that the real point of the website is to gamble for

money or things of value:

## Can I really win prizes?

1 month ago · Updated

YES!

Each and every day players from across the U.S. win "redeemable" Sweeps Coins and exchange those for thousands of dollars in real cash prizes or digital gift cards from eCommerce merchants, retailers, and restaurants across the country.

*Golden Hearts Games* processes winners' payouts quickly. For example, payouts via digital gift cards are typically processed and emailed within 1 to 2 business days; payouts sent to a verified PayPal account are typically paid within 1 to 2 business days; and payouts via ACH direct deposit to a bank account typically take 2-3 business days.

60.     In sum, the parallels between www.goldenheartsgames.com and the Internet

sweepstakes café scheme are clear:

- Both sell a "product" that comes with a commensurate number of "free" sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting.  Instead of the cafés selling a "prepaid phone card," Defendant sells a virtual gold coin and gives a commensurate amount of "free" "Sweep Coins."

- Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald's Monopoly sweepstakes.

- Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.

- Both offer several ways to get free entries without requiring a product purchase, such as by playing free, unlockable "Mini-Games," although the number of free entries awarded through this method is a very low amount, if any at all.

- In addition, the "casino-like atmosphere" of www.goldenheartsgames.com further supports the conclusion that the true purpose of the website is "to legitimize illegal gambling." *U.S. v. Davis*, 690 F.3d 330, 339 (5th Cir. 2012).

**D.    Defendant Has Evaded The Laws Of Massachusetts And Other States**

61.    Defendant advertises and presents Golden Hearts to consumers in Massachusetts as a legitimate online business.  But this is false.  In fact, Golden Hearts is an illegal enterprise.  Golden Hearts' online presence and advertising provided an aura of legitimacy and legality to Plaintiff and Class members.

62.    In 2010, the Massachusetts legislature passed a new law specifically aimed at curbing illegal gambling at Internet cafés. *See* RULES AND REGULATIONS--CYBER CAFES, 2012 Mass. Legis. Serv. Ch. 187 (H.B. 3765) (WEST).

63.    The resulting statute, Mass. Gen. Laws Ann. ch. 271, § 5B, provides in relevant part as follows:

> It shall be unlawful for any person to knowingly possess with the intent to operate, or place into operation, an electronic machine or device to: (1) conduct a sweepstakes through the use of an entertaining display, including the entry process or the reveal of a prize; or (2) promote a sweepstakes that is conducted through the use of an entertaining display, including the entry process or the reveal of a prize.

64.    "Any person who violates this section shall be punished by a fine of not more than $250,000 per electronic machine or device placed into operation or by imprisonment in state prison for not more than 15 years, or by both such fine and imprisonment." *Id.* at § 5B(d).

65.     The term "sweepstakes" includes any game in "which, **with or without** payment of any consideration, a person may enter to win or become eligible to receive any prize, the determination of which is based on chance." Mass. Gen. Laws Ann. ch. 271, § 5B(a) (emphasis added). So, any argument by Golden Hearts that no purchase is necessary to participate in the sweepstakes is irrelevant.

66.     The statute also applies to online gaming that simulates casino gambling, because the term "entertaining display" means any "visual information" that "takes the form of actual game play or simulated game play," and the definition of "electronic machine or device" includes screen and "server based" technology that "utilize[s] software" and "computer game[s]." *Id.*

67.     Similarly, 940 Massachusetts Code of Regulations, chapter 30 *et seq.*, governs "Unlawful, Lotteries, Sweepstakes and de Facto Gambling Establishments." Chapter 30.04 provides as follows:

(1) It is an unfair and deceptive act or practice in violation of M.G.L. c. 93A, § 2(a) for a person to solicit or accept payment for a chance to win a prize.
(2) With respect to a business or a transaction that involves or purports to involve both a chance to win a prize and the sale or purported sale of a good or service, it is an unfair and deceptive act or practice in violation of M.G.L. c. 93A, § 2(a) for any person to engage in a business or engage in a transaction where a gambling purpose predominates over the *bona fide* sale of *bona fide* goods or services.

68.     This provision applies to any business or entity, "physical or otherwise," and thus includes online businesses. *See id.* at Ch. 30.03 (defining "Establishment").

69.     The term "sweepstakes" includes any game or promotion where a person may become eligible to receive a prize, "with or without consideration." *Id.* (defining "Sweepstakes").

70.     As explained by the Massachusetts Supreme Court, the Massachusetts Attorney General has engaged in a well-publicized effort to "curb the proliferation—and secure the regulation—of online gambling …." *New England Internet Café, LLC v. Clerk of Superior Court for Criminal Business in Suffolk Cnty.*, 462 Mass. 76, 79 (2012). In response to arguments that "such gaming

involves legitimate sweepstakes offers, the Attorney General has stated her unequivocal position that it constitutes illegal gambling." *Id.*

71.    Golden Hearts "solicit[s] or accept[s] payment for a chance to win a prize" when it sells Gold Coins, because such purchases always include Sweeps Coins, which Golden Hearts states can be redeemed for "prizes."

72.    Given that Golden Hearts repeatedly describes its websites as offering "casino-style" gaming, and does not offer much if anything else, the "gambling purpose" of the website necessarily "predominates" over any purported non-gambling offerings.

## CLASS ALLEGATIONS

73.    Plaintiff seeks to represent a class defined as all individuals who, in the United States, purchased virtual currency on www.goldenheartsgames.com during the applicable limitations period (the "Class").

74.    Plaintiff also seeks to represent a subclass defined as all individuals who, in the Commonwealth of Massachusetts, purchased virtual currency on www.goldenheartsgames.com during the applicable limitations period (the "Massachusetts Subclass") (together with the Class, the "Classes").

75.    Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

76.    The above class definitions are placeholders, and pursuant to Fed. R. Civ. P. 23(c)(a)(C), may be altered or amended any time "before final judgment." Therefore, subject to

additional information obtained through further investigation and discovery, the foregoing class definitions may be modified later in these proceedings, including through the use of subclasses.

77.    **Numerosity**.  On information and belief, tens of thousands of consumers fall into the definition of the Classess.  Members of the Classes can be identified through Defendant's records, discovery, and other third-party sources.

78.    **Commonality and Predominance**.  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a)    Whether Plaintiff's and Class members' play on Defendant's online casino games constitutes gambling under Massachusetts law;

(b)    Whether Plaintiff and the Classes lost money gambling to Defendant as defined by Mass. Gen. Laws Ann. ch. 4, § 7;

(c)    Whether Plaintiff and the Classes are entitled to recover their monies spent on Defendant's casino games pursuant to Mass. Gen. Laws ch. 137 § 1;

(d)    Whether Defendant misrepresented and/or failed to disclose material facts concerning its illegal online gambling;

(e)    Whether Defendant's conduct was unfair and/or deceptive; and

(e)    Whether Plaintiff and the Classes sustained damages with respect to Mass. Gen. Laws Ch. 93A.

79.    **Typicality**.  Plaintiff's claims are typical of the claims of the other members of the Classes in that, among other things, all Class members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

80. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Furthermore, Plaintiff has no interests that are antagonistic to those of the Classes.

81. **Superiority**.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would thus be virtually impossible for the Classes to obtain effective redress for the wrongs committed against the members on an individual basis. Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

### COUNT I
### Violation of Mass. Gen. Laws Ch. 137 *et seq.*
### (On Behalf Of The Classes)

82. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

83. Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

84. The Commonwealth of Massachusetts' "Recovery of money or goods lost at gaming

or sports wagering; limitation period" statute, Mass. Gen. Laws ch. 137 § 1, provides a losing gambler

with a first-party cause of action to recover any losses it suffered. It reads:

> Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof.

Mass. Gen. Laws ch. 137 § 1.

85.     Defendant's online casino games constitute gaming in the context of the statute. The

term "illegal gambling" includes "a banking or percentage game played with cards, dice, tiles,

dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks,

credit or any representative of value . . . [.]" Mass. Gen. Laws Ann. ch. 4, § 7 (West). While the term

"banking or percentage game" is undefined, it is a commonly used term in the gambling industry and

includes unlicensed "casinos and slot parlors." *See Abdow*, 468 Mass. at 483.

86.     Defendant's online casino games constitute illegal gambling because the players

provide consideration (e.g., purchase virtual coins and wager the coins) and by an element of chance

(e.g., by spinning a virtual slot machine) create a right to some things of value.

87.     As such, Plaintiff and the Classes gambled when they purchased virtual coins to wager

at www.goldenheartsgames.com and wagered said coins in Defendant's games of chance.

88.     As a direct and proximate result of Defendant's operation of its games, Plaintiff and

each member of the Classes have lost money and/or goods wagering on Defendant's games of chance.

Plaintiff, on behalf of himself and the Classes, seeks an order (1) requiring Defendant to cease operation of its gambling devices; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

89.    Plaintiff additionally seeks treble damages pursuant to Mass. Gen. Laws ch. 137 § 1.

<u>COUNT II</u>
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act,**
**Mass. Gen. Laws Ch. 93A *et seq.***
**(On Behalf Of The Classes)**

90.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

91.    Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

92.    Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("MUDBPA")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce." An act is "deceptive" under Chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991).

93.    It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." *See* Mass. Gen. Laws Ann. ch. 93A, § 2.

94.    Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other

persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons." *Id.* § 9.

95.     Pursuant to the definitions codified at Chapter 93A § 1, Defendant is a "person," and Defendant is engaged in "trade" and "commerce" in Massachusetts by making its illegal gambling website accessible to the people of Massachusetts, and because Defendant resides in Massachusetts and the acts and omissions alleged above and incorporated herein originated from Massachusetts.

96.     By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

97.     Defendant's misrepresentations deceive and have a tendency to deceive a reasonable consumer and the general public.

98.     Defendant's acts and omissions are material, in that a reasonable person would attach importance to understanding the illegality of Defendant's website and would refrain from making purchases for coins on the website.

99.     Plaintiff and members of the Class reasonably relied upon and were deceived by Defendant's omissions when they visited and purchased coins on www.goldenheartsgames.com.

100.    Defendant knowingly omitted that its website is illegal at the time of the purchase and at all relevant times thereafter.

101.    Had Plaintiff and Class members known that www.goldenheartgames.com was illegal, they would not have purchased coins on the website.

102.    Defendant's misconduct caused Plaintiff and Class members to suffer an injury, adverse consequence, or loss because they would not have purchased coins on the website if the true

facts were known about its legality.

103.    Plaintiff and members of the Classes have been harmed by this injury, adverse consequence, and/or loss.

104.    The MUDBPA represents a fundamental public policy of the Commonwealth of Massachusetts.

105.    For each loss, Plaintiff and each member of the Classes may recover an award of actual damages or twenty-five dollars, whichever is greater. Ch. 93A § 9(3).

106.    Because Defendant acted willfully or knowingly, Plaintiff and each member of the Classes may recover up to three but not less than two times this amount. In addition, Plaintiff may recover attorneys' fees and costs.

107.    Plaintiff and the members of the Classes may also seek the imposition of injunctive relief which limits and polices Defendant's representations within or reaching Massachusetts. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Classes, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Classes, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b)     For compensatory damages on all applicable claims and in an amount to be proven at trial;

(c)     For restitution on all applicable claims and in an amount to be proven at trial;

(d)     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

(e)     For treble damages pursuant to Mass. Gen. Laws ch. 137 § 1.

(f)     For an order enjoining the wrongful conduct alleged herein, including a nationwide injunction shutting down the website;

(g)     For other appropriate injunctive and other equitable relief;

(h)     For costs;

(i)     For pre-judgment and post-judgment interest as provided by law;

(j)     For attorneys' fees under the account contracts, the common fund doctrine, and all other applicable rules and law; and

(k)     For such other relief as the court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: January 28, 2026            By:     /s/ Joel Smith
                                                    Joel Smith

**SMITH KRIVOSHEY, PC**
Joel D. Smith (BBO 712418)
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Telephone: 617-377-4704
Facsimile: (888) 410-0415
E-Mail: joel@skclassactions.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey*
166 Geary Str STE 1500-1507
San Francisco, CA 94108

Telephone: 415-839-7077
Facsimile: (888) 410-0415
E-Mail: yeremey@skclassactions.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie*
Julian C. Diamond*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta*
Matthew A. Girardi*
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

*Attorneys for Plaintiff*

* *Pro hac vice* application forthcoming